BANGOR AND AROOSTOOK RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20571.   Promulgated March 7, 1951.

*Joseph M. Jones, Esq.*, for the petitioner.
*Leo C. Duersten, Esq.*, for the respondent.

580

OPINION.

RAUM, *Judge:* In 1942 petitioner repurchased its own bonds, paying $497,553.30 for bonds of the face amount of $634,000, and realized a taxable gain of $136,446.70. *United States* v. *Kirby Lumber Co.,* 284 U. S. 1; *Commissioner* v. *Jacobson,* 336 U. S. 28; *Spear Box Co.* v. *Commissioner,* 182 Fed. (2d) 844 (C. A. 2). It elected, however, to take advantage of a statutory option under which the gain was excluded from its 1942 gross income, and, instead, the gain was applied

in reduction of the basis of property held by petitioner. Sections 22 (b) (9) and 113 (b) (3), Internal Revenue Code.[1]

Thereafter, in calculating its excess profits tax liability for 1943, petitioner used the invested capital method for computing its excess profits credit. Part of that credit consisted of its "accumulated earnings and profits" as of the beginning of 1943.[2] Petitioner included its 1942 bond profit in its accumulated earnings and profits as of the beginning of 1943. Respondent, however, excluded that bond profit from petitioner's accumulated earnings and profits and, with the resulting reduction in petitioner's excess profits credit, found a defi-

---

[1] SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(9) INCOME FROM DISCHARGE OF INDEBTEDNESS.—In the case of a corporation, the amount of any income of the taxpayer attributable to the discharge, within the taxable year, of any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a security (as hereinafter in this paragraph defined) if the taxpayer makes and files at the time of filing the return, in such manner as the Commissioner, with the approval of the Secretary, by regulations prescribes, its consent to the regulations prescribed under section 113 (b) (3) then in effect. In such case the amount of any income of the taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction. As used in this paragraph the term "security" means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation. This paragraph shall not apply to any discharge occurring before the date of enactment of the Revenue Act of 1939, or in a taxable year beginning after December 31, 1951.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

\* \* \* \* \* \* \*

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

is excluded from gross income under section 22 (b) (9) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property held (whether before or

\* \* \* \* \* \* \*

(3) DISCHARGE OF INDEBTEDNESS.—Where in the case of a corporation any amount after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. The amount to be so applied (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 22 (b) (9)) and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Commissioner with the approval of the Secretary) in effect at the time of the filing of the consent by the taxpayer referred to in section 22 (b) (9). The reduction shall be made as of the first day of the taxable year in which the discharge occurred except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began.

[2] SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts reduced as provided in subsection (b)—

\* \* \* \* \* \* \*

(4) EARNINGS AND PROFITS AT BEGINNING OF YEAR.—The accumulated earnings and profits as of the beginning of such taxable year;

ciency. This proceeding. was brought to review that determination of deficiency.

The concept of "earnings and profits" has been an important part of Federal tax legislation for many years, being employed for income tax purposes to identify the source of taxable corporate dividends. Section 115 (1)[3] of the Internal Revenue Code, which was added by section 501 of the Second Revenue Act of 1940, was the first attempt by Congress to deal with the meaning of the concept; prior thereto its intended scope was developed by judicial and administrative construction. See *Commissioner* v. *Wheeler*, 324 U. S. 542, 545. Moreover, section 115 (1) deals with "earnings and profits" only in certain particulars; it makes no attempt to furnish a comprehensive definition of the term. But to the extent that it does affect the meaning of the term, it was intended to apply both for income tax and excess profits tax purposes,[4] and the rationale and content of the concept as developed prior to 1940, to the extent that it has remained in force for the income tax, is in general likewise applicable to the excess profits tax. Cf. *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496, 500.

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \*

(1) EFFECT ON EARNINGS AND PROFITS OF GAIN OR LOSS AND OF RECEIPT OF TAX-FREE DISTRIBUTIONS.—The gain or loss realized from the sale or other disposition (after February 28, 1913) of property by a corporation—

(1) for the purpose of the computation of earnings and profits of the corporation, shall be determined, except as provided in paragraph (2), by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain, except that no regard shall be had to the value of the property as of March 1, 1913; but

(2) for the purpose of the computation of earnings and profits of the corporation for any period beginning after February 28, 1913, shall be determined by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain.

Gain or loss so realized shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing net income under the law applicable to the year in which such sale or disposition was made. Where in determining the adjusted basis used in computing such realized gain or loss the adjustment to the basis differs from the adjustment proper for the purpose of determining earnings or profits, then the latter adjustment shall be used in determining the increase or decrease above provided. For the purposes of this subsection, a loss with respect to which a deduction is disallowed under section 118, or a corresponding provision of a prior income-tax law, shall not be deemed to be recognized. Where a corporation receives (after February 28, 1913) a distribution from a second corporation which (under the law applicable to the year in which the distribution was made) was not a taxable dividend to the shareholders of the second corporation, the amount of such distribution shall not increase the earnings and profits of the first corporation in the following cases:

(1) No such increase shall be made in respect of the part of such distribution which (under such law) is directly applied in reduction of the basis of the stock in respect of which the distribution was made.

(2) No such increase shall be made if (under such law) the distribution causes the basis of the stock in respect of which the distribution was made to be allocated between such stock and the property received.

[4] The committee reports with respect to the Second Revenue Act of 1940, which also enacted the excess profits tax, made it clear that section 115 (1) was intended to be applicable to both the income tax and the excess profits tax. See H. Rept. No. 3002, 76th Cong., 3d Sess., p. 60; H. Rept. No. 2894, 76th Cong., 3d Sess., pp. 41, 42. See also Treasury Regulations 112, Section 35.718-2.

Section 115 (1) is literally not applicable here. By its terms, it deals with the effect on "earnings and profits" of certain corporate distributions and of "gain or loss realized from the sale or other disposition of property." We have before us neither a corporate distribution nor a sale or other disposition of property by petitioner. The gain herein grew out of petitioner's reacquisition of its own obligations, and does not fall into either of the foregoing categories. Accordingly, since section 115 (1) does not provide a comprehensive test applicable in all circumstances as the mandatory measure of earnings and profits, and since the present situation is not covered by the provisions of section 115 (1), it becomes necessary to determine petitioner's earnings and profits under the statute apart from these provisions.

That is not to say, however, that section 115 (1), and the expression of legislative intent accompanying its enactment, may not be of guidance in the treatment of situations not within its boundaries. When it enacted section 115 (1), Congress was aware that an extensive body of interpretative law had grown up in connection with its use of the term "earnings and profits." It was prompted to act, not primarily to change that law, but to make clear in certain areas the extent to which that law was an accurate embodiment of its pre-existing intent. In the words of the Committee on Ways and Means sponsoring the provision which culminated in section 115 (1), "The purpose of this amendment is *to clarify* the law with respect to what constitutes earnings and profits of a corporation." (Emphasis added.) H. Rept. No. 2894, 76th Cong., 3d Sess., p. 41. That law, which was then the subject of Congressional examination and which had survived enactment of earlier revenue statutes, treated earnings and profits as unaffected by a transaction on which gain or loss was not recognized for income tax purposes. Cf. *Commissioner* v. *Wheeler*, 324 U. S. 542, 547; *Commissioner* v. *Sansome*, 60 Fed. (2d) 931, 933 (C. A. 2). See also *Commissioner* v. *Munter*, 331 U. S. 210, 214–215. Some decisions had been rendered, however, which increased earnings and profits because of unrecognized gain in connection with corporate reorganizations or related transactions. Congress desired to clarify the law by disapproving the latter decisions (H. Rept. No. 2894, 76th Cong., 3d Sess., pp. 41–42) and giving statutory recognition to the principle that "there shall be no increase or decrease in earnings and profits by reason of a wholly unrecognized gain or loss" (Sen. Rept. No. 2114, 76th Cong., 3d Sess., p. 25). It therefore provided in section 115 (1) that, as to the sale or other disposition of property, "Gain or loss so realized shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or

loss was recognized in computing net income under the law applicable to the year in which such sale or disposition was made."

We think that although section 115 (1) is not applicable here, it nevertheless gave expression to a concept of "earnings and profits" that was already widely recognized and which inheres in the meaning of those words. Cf. *Commissioner* v. *Estate of Holmes*, 326 U. S. 480, 487–488. Surely, by taking pains to make certain that unrecognized gains or losses from sales or other dispositions of property would not be reflected in earnings and profits, Congress could not have intended thereby to produce a different result with respect to other unrecognized gains or losses, merely by failing to mention them. There is nothing in the history of the Second Revenue Act of 1940, which added section 115 (1) to the Code, that suggests any such purpose. Basic considerations with respect to the interpretation of the revenue laws do not allow a taxpayer, in the absence of clear language to the contrary, to elect to postpone the recognition of income for purposes of being taxed, and at the same time permit it inconsistently to treat such unrecognized income as earnings and profits. Cf. *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496; *May, Stern & Co.* v. *Commissioner*, 181 Fed. (2d) 407 (C. A. 3), certiorari denied, 340 U. S. 814; *White Bros. Co.* v. *Commissioner*, 180 Fed. (2d) 451 (C. A. 5), certiorari denied, 340 U. S. 825; *Benjamin Siegel*, 29 B. T. A. 1289; *Corinne S. Koshland*, 33 B. T. A. 634.

Nor is the result sought by petitioner required by the fact that Congress in 1942 amended section 115 (1) by adding the sentence dealing with wash sales. For, notwithstanding the concern which prompted the enactment of the 1942 amendment, it is quite possible that the provisions as they stood prior to the 1942 amendment might have produced the same result, just as the original enactment in 1940 of section 115 (1) itself was regarded in certain respects merely as declaratory of existing law in *Commissioner* v. *Wheeler*, 324 U. S. 542. Moreover, the report of the House Ways and Means Committee which sponsored the amendment, in making known its impression that disallowed losses from wash sales could affect earnings and profits under section 115 (1) as it then stood, made clear its understanding that giving such effect to those losses would be "contrary to the uniform practice prior to the enactment of Section 501 of the Second Revenue Act of 1940." H. Rept. No. 2333, 77th Cong., 2d Sess., p. 93. The purpose of the amendment was to assure adherence to that uniform practice, which was thought to have been interrupted by section 115 (1). As we have observed, there may well be some doubt that section 115 (1), as it was originally enacted in 1940, caused such an interruption. But whatever view is taken in this regard, a wash sale, unlike income from discharge of indebtedness, is a transaction with respect

to property within the general coverage of section 115 (1), and any change in practice produced by that section affected the treatment of the former only. The rule we deem applicable to this case is that of the "uniform practice" understood by the legislature to have obtained prior to 1940 respecting wash sales, and that practice supports the conclusion that unrecognized income from discharge of indebtedness is to be excluded from earnings and profits.

The present case must be distinguished from situations where fully realized income which is exempt from tax, such as interest on state bonds, is included in earnings and profits. See Treasury Regulations 111, section 29.115-3. Although the general introductory language of section 22 (b) of the Code characterizes the various types of income in the subdivisions to follow as "exempt," the fact is that, under the specific provisions of section 22 (b) (9), the income from discharge of indebtedness escapes taxation only by reason of the option in section 22 (b) (9), and the effect of exercise of the option is not a complete withdrawal or insulation of the profit from tax. Unlike other exclusions from income provided for by section 22 (b), the profit from discharge of indebtedness is excluded only on the condition that it be applied in reduction of the basis of property held by the petitioner. Sections 22 (b) (9), 113 (b) (3), Internal Revenue Code. In reality, by providing for an adjustment altering the basis of property which petitioner would otherwise be entitled to use, Congress did not relieve the profit of tax but only postponed the time for levying the tax.[5] Instead of collecting a tax on the profit when received, Congress merely deferred recognition of the profit and collection of the tax until the time at which the property with the reduced basis was sold or otherwise disposed of.[6] See *Commissioner* v. *Jacobson*, 336 U. S. 28, 44–46.

[5] We are aware, of course, that profit from discharge of indebtedness in certain circumstances is rendered permanently exempt from excess profits tax. Sections 711 (a) (1) (C) and 711 (a) (2) (E), Internal Revenue Code. But, as noted above, p. 584, the term "earnings and profits" for excess profits tax purposes has the same meaning that attaches to it for income tax purposes, and since recognition of the bond profit for income tax purposes is merely postponed, that profit cannot come into earnings and profits until subsequent recognition. Nothing in the history of sections 711 (a) (1) (C) and 711 (a) (2) (E) of the Code suggests a contrary result.

Nor is there anything in the history of section 711 (b) (1) (C), excluding such profit from base period income in the computation of the excess profits credit under the income method, which calls for a contrary result here. Where, as here, the credit is computed on the invested capital method. Congress appears to have left gain from discharge of indebtedness to be reflected in the credit to the extent that it is included in earnings and profits in accordance with the principles that are generally applicable in determining earnings and profits.

[6] Where the property involved is of a depreciable character, recognition may occur gradually over the years by reason of the smaller depreciation deductions which result from the reduction in the basis of the property. Thus, in this very case there was a reduction in depreciation and related items in 1942 to the extent of $1,736.69, which petitioner does not contest, and which is reflected in its accumulated earnings and profits.

This method of treating the profit is comparable to the treatment accorded nontaxable exchanges governed by the so-called reorganization provisions in section 112 of the Code, where recognition is similarly postponed. In both situations, the earnings and profits are affected, not at the time of the original unrecognized transaction, but at the time that the gains or losses are actually taken into account in computing taxable income. True, the result with respect to section 112 transactions, dealing with sales and exchanges, is specifically called for by section 115 (1),[7] but, as we have seen, section 115 (1) was merely declaratory of existing law in this regard, and the same result is required by a proper interpretation of the term "earnings and profits."

Moreover, petitioner's position is open to the objection that it might actually require the same gains to be included twice in its earnings and profits. As the Supreme Court emphasized in *Commissioner* v. *Wheeler*, 324 U. S. 542, 547, section 115 (1) expressly prescribes, as the basis for computing gain or loss for purposes of earnings and profits, "the adjusted basis * * * for determining gain." As to the property affected by petitioner's election in the instant case, the adjusted basis for determining gain is the basis as adjusted downward under section 113 (b) (3). When petitioner disposes of that property, the adjusted basis will increase the taxable gain or decrease the deductible loss. Since use of the same basis seems to be required under section 115 (1), a comparable increase in earnings and profits apparently will take place at the time of disposition of the property. If this consequence follows from the adjustment in basis under section 113 (b) (3), there would be a duplication in the increase in petitioner's earnings and profits were they also to be increased, as petitioner contends they should be, upon the realization of the bond profit responsible for the basis adjustment. A construction which involves such an irrational result is to be avoided in the presence of an acceptable alternative. Cf. *Taylor-Wharton Iron & Steel Co.*, 5 T. C. 768, 781–783.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

[7] Indeed, petitioner suggests that section 115 (1) was intended to deal exclusively in this connection with section 112 transactions, and that the only unrecognized gain which does not augment earnings and profits is the gain which is relieved of tax by section 112. While it is true that the committee reports accompanying the legislation which added section 115 (1) to the Code made prominent reference to section 112, both the Senate Finance Committee and the Conference Committee indicated that section 112 was mentioned only by the way of illustration in referring to realized but unrecognized gains that do not increase earnings and profits; the reports of these committees explicitly used such phrases as "for instance" and "for example" in referring to section 112. See Sen. Rept. No. 2114, 76th Cong., 3d sess., pp. 23–24; H. Rept. No. 3002, 76th Cong.. 3d sess., p. 60. Thus, even if section 115 (1) governed the present situation, the effect which petitioner seeks to attribute to it is not justified by its legislative history.